May it please the court, by way of this appeal, a felon has taken the position that the trial court erred when it granted defendant's partial summary judgment on plaintiff's wrongful discharge claim in violation of Labor Code 1102.5. By doing so, it precluded plaintiff from presenting to the jury the strongest claim that Ms. Brewer was terminated from Leprino as a result of her numerous complaints about gender discrimination, FMLA retaliation, and harassment based on taking FMLA. Counsel, one question I have in this case at the outset is what incidents were described in the summary judgment papers as opposed to the evidence that came out at trial? When the judge ruled on summary judgment, there were declarations, affidavits, deposition testimony in front of the judge, I forget which, and Judge McNamee ruled on the basis of those. There was more testimony that came out later in trial, but of course that wasn't in front of Judge McNamee. So, what incidents were the subject of the summary judgment motion? Thank you, Your Honor. The following incidents were brought to the attention of Judge McNamee on the motion for summary judgment. That Miranda, while being Ms. Brewer's supervisor, stated to Ms. Brewer that she preferred working with men over women because men have fewer child care applications. She also stated to Ms. Brewer that she was tracking Ms. Brewer's FMLA hours to get her fired. She also stated to Ms. Brewer that she was a bad employee for taking FMLA leave because of her son's medical condition, specifically asthma. Ms. Brewer, and this was all on the motion for summary judgment, Ms. Brewer then took these complaints up the corporate ladder. Okay, so let me ask you up the corporate ladder. Your brief doesn't address up the corporate ladder to HR, either in the complaint or the opposition to the summary judgment motion. Sorry. So, tell me to whom up the corporate ladder she brought her complaints? Your Honor, thank you for that question. The opposition to the motion for summary judgment did address those issues. So, the first complaint was to Mr. Jason Rocha, who was a senior supervisor. Mr. Rocha then stated to Ms. Brewer and threatened her employment by stating, you're lucky you're not flipping burgers at Burger King. She then complained to Tiffany Lubuga, who was also a supervisor. Tiffany Lubuga was a witness to the statements by Ms. Miranda, and she was bothered by it and told Ms. Brewer to take it up the corporate ladder to upper management. Then Ms. Brewer brought these complaints to the attention of Don Doyle, who was a processing manager. Don Doyle was a plant manager. He had 225 people reporting to him at that time. Ms. Brewer then brought these complaints to the attention of Cass Anderson, who was the HR manager, and David Hines, who was in charge of investigating the lockout tagout violation. That's the corporate ladder that we were talking about. I'm sorry to focus so much on the facts, but this is a summary judgment motion. Can you tell me what the record shows that she took these complaints? I was trying to find in the record what she says she told each of these people. What did she tell them? She told them that, number one, Miranda told me that she preferred working with men over women because men have fewer child care obligations. She told them, number two, that Miranda was tracking her FMLA hours to get her fired. And she told them, number three, that Miranda told her that Ms. Brewer was a bad employee for taking FMLA leave because of her son's medical condition. Okay, so thank you. Now you can focus on where you're going, but those are facts that are important to me. Thank you, Your Honor. I didn't mention this in the beginning, but I would like to save four minutes for rebuttal. I'll try to help you. Thank you. So, as I mentioned, Ms. Brewer took the complaints to the corporate ladder. On July 9th, after Ms. Brewer complained to Don Doyle, to Jason Rocha, who were all supervisors, after Tiffany LaBuga was aware of all these complaints and all these statements by Ms. Miranda, Miranda then wrote Ms. Brewer up for a lockout tagout violation. Even though, and the evidence is very clear on summary judgment, Miranda herself committed these lockout tagout violations on numerous occasions. Elmer Meade, the safety supervisor, again, this was in his definition. Elmer Meade, who was a safety supervisor, testified that these were gray areas, that these people were told to keep the line moving because they did not want any downtime. He testified that numerous supervisors, numerous group leaders were on the roll and consistently violated lockout tagout violations. In fact, when Ms. Miranda observed Ms. Brewer on the rollers, she stated to Mr. Vega that I'd let this slide before. Miranda then prepared a report before it becomes integral to this case. So, excuse me, counsel. This is Judge Marshall. I just have a question. I want to focus more on what you consider to be the protected activity. And so I assume it is the three areas that you mentioned. The preference for men, the tracking her leave, and that she was a bad employee. So, are those the three statements that you consider to be the protected activity? That's correct, your honor. The three statements are what we consider to be a protected activity. The fact that she complained about those three statements is the protected activity. Judge Marshall, we're having trouble with your audio. Judge Marshall, I apologize. I can't hear you. Judge Marshall said that Olga and Doyle. Let's pause the clock for a second and let's see if we can get Judge Marshall back on with better audio. I assume somebody's looking for that. Something happened. I don't know what. Yeah, now we can hear you pretty well, Judge. You want to try again? So, Judge, it looks like your connection is frozen. The best thing to do might be for you to leave the meeting and then reconnect. Why don't we wait for Judge Marshall to do that? Yes, we can hear you, but your video is frozen. Okay, I can see the clock now. So what should I do? Now we hear you pretty well, Judge. Okay. Go ahead and ask the question again and we'll see if we can proceed from here. Okay, what I was trying to determine is whether counsel could tell us if the record reflects any more specific dates of when the statements were made or when she reported it to the supervisors. Certainly. So the very first complaints happened on or about Easter Sunday, April 20th, 2014. This is when Ms. Brewer walked into the office and observed Ms. Miranda with her head in between the torso of another employee. No, I'm just looking for dates here. You don't have to describe the incidents. That's fair. Thank you. So the first incident was around April 20th, when she went up the corporate ladder to place in June of 2014. And the final complaint to Cass Anderson and David Hines took place on July 10th, and subsequently there was an email from Ms. Brewer to Mr. Anderson. Okay, so to go back to my question, or Judge Marshall, I'm sorry, please continue. No, that's okay. Your question. I was trying to figure out what your client complained to, to the people on these two dates, and that's why I asked the question before. I thought the complaint on the first date was about having observed Ms. Miranda doing whatever she was doing with another person and not about statements Ms. Miranda made to her. Am I wrong about that? No, Your Honor, you're right, but the first complaint goes a little bit further, which is that she complained about observing Ms. Miranda doing what she did, and then she also complained about other employees coming to her and telling her, telling Brandy that instead of Brandy, Ms. Brewer, that Miranda is showing favoritism towards other male employees. Okay, but she did not complain on that date about the three things you talked about. That's correct, Your Honor. Okay, now on the second date, what did she say to the supervisor? Correct, so following, so the second complaint were, so following this event, Ms. Miranda approached her and says those three things to her. Then Ms. Brewer complains about these three statements that were told to her by Ms. Miranda, that she was checking her FMLA hours, that she was pretending to work with male females, and that she was a bad employee for taking FMLA leave. And that was on the second date that you gave to Judge Marshall? Correct. Okay, you wanted to save some time for rebuttal. I don't know whether or not you'd finish what you wanted to say, so I just want to remind you of the clock. One thing, Your Honor, one quick point that I want to bring up is Miranda wrote the report. Miranda submitted the report. Miranda suspended Ms. Brewer, even though the defendant claims that Miranda was no longer a supervisor. She suspended Ms. Brewer, and she admits to it in the report that she prepared, that she is suspending her. At the termination, at the investigatory meeting, there was Ms. Brewer complaining about all these events that took place and talking to Cass Anderson, stating that these are happening, and this is what Miranda is trying to do with this. This is why she submitted this complaint. Cass Anderson, the HR manager, states, I am not equipped to handle this situation. She then realizes that she's getting no help, and she sends an email to Mr. Anderson, saying, how do I file a harassment claim? Two hours later, Don Doyle sends an email, this is all part of the record, stating, I talked to Cass Anderson and Aaron McDaniel before any investigation had taken place. No investigation had taken place at that time, except for the meeting with Ms. Brewer, and states, this is a termination action. The investigation took place later on, and the report was submitted on, I believe, on July 16th. There were two reports, actually, conflicting reports, but there was no investigation as to what actually happened by David Hines when Don Doyle sent the email, stating, this is now a termination action after speaking with Cass Anderson. I'll reserve my residence time for this item. Mr. Hoffman. Good morning, your honors. May it please the court, my name is Adam Hoffman. I'm here today on behalf of Appellee Leprino Foods Company. Your honors, Leprino terminated appellant Brandi Brewer for a serious, life-threatening violation of Leprino's zero-tolerance work safety policies. That decision followed a detailed and independent investigation by plant safety personnel, and was consistent with both the standards for discipline established by the policy that Ms. Brewer violated, and with the termination of 10 other employees by Leprino in the preceding three years. On this record, no reasonable jury could have found that Leprino's decision violated whistleblower protections or warranted an award of punitive damages. The court should affirm the judgment. Mr. Hoffman, can I ask you, what issues went to the jury? Your honor, it was the FMLA retaliation and gender discrimination that went to the jury. Okay, so do they resolve for us the question of whether or not she was fired for taking the leave, or because of her gender? Yes, your honor, that's what the jury verdict shows. Okay, I know you don't argue this in your brief, but how does that correlate with her whistleblower claim? In other words, if she says, I was fired for complaining about FMLA violations or complaining about gender discrimination for reporting them, and the jury found that she wasn't fired on those bases, does that affect the retaliation claim at all? Your honor, in my mind, it does very much. But you don't argue that. Well, I wanted to give credence to the specifics of the jury's verdict, which were findings that she was not fired on account of her gender or on account of her FMLA leave. The jury didn't make an express finding regarding the reasons for her termination, and so to my mind, I didn't want to oversell, frankly, the jury's verdict on this point. But I agree with you, the implication of the jury's verdict here is exactly as I just described, which is Brewer was terminated for violating the safety policy, and not for any other reason. But that's not literally what the verdict says. Can you address the first question I asked your colleague? Because it seems to me there was different evidence at trial than there was presented at the summary judgment stage. What was in front of Judge McNamee at the summary judgment stage? Yes, your honor. So there were two incidents of alleged protected reporting at the summary judgment stage. That was the April 2014 Ms. Brewer's statements to Aaron McDaniel regarding the, we'll call it the Easter Sunday incident. And the reporting to other supervisors, Jason Rocha, Tiffany Labuga, and Don Doyle, sometime in late June or early July of 2014. Now, I hesitated for a second because very clearly on appeal, Ms. Brewer has also raised the statements that she made during the investigation of her lockout tagout violation on July 10, 2014. But as we argued in our briefs, that particular set of statements was not identified in the district court as a basis for retaliation claim. Ms. Brewer did mention those statements in connection with her gender discrimination claim, but did not preserve arguments that those statements constituted protected whistleblower activities. And under the Coons case and the Moreno roofing case, we don't think she's properly preserved those arguments. So to address your question, circling back to the beginning, it was the April and June reporting that were before the district court judge on summary judgment specifically. So why weren't either of those protected? I don't believe they were, your honor. And so starting with the April, I think it's worth taking each one in turn, if I may. Starting with the April conversations with Aaron McDaniel, Ms. Brewer's own testimony reflects that she was reaching out to Ms. McDaniel regarding complaints and what in the record appears to be gossip. Among other hourly employees and that she was expressing concern for Ms. Miranda, not complaining about reasonably perceived illegal activities and was seeking Ms. McDaniel's advice on how to handle the hourly employees concerns. So there's nothing on that record to support the finding that she actually or reasonably believed she was reporting illegal activities. And without getting into all the details, I take it the concern was there might be some romantic escapades going on between Ms. Miranda and others. That seems to be the case, your honor. Ultimately, Cass Anderson investigated that incident based on the hourly employees reporting, which was all that he was aware of at the time. And he determined that there had not been a improper activity, but he transferred Ms. Miranda anyway in order to basically cut down on the gossip. Assuming that the allegations that Ms. Brewer made were true about that, would they violate any law? No, your honor. But is it a violation of any law for a supervisor to be having romantic relationships with those she supervises? Absolutely not, your honor. As you say, not a good management practice, but there's no law that has been cited that a romantic relationship rises to the level of a violation of law, at least with respect to any of the other employees. That is anybody other than the employee who was part of that romantic relationship. No claim of that here. So, and we've cited for, well, appellant has cited the Yanowitz case, which reflects the idea that these kinds of interpersonal matters are not the kinds of violations of law, the reporting of which can support a whistleblower claim. So turn to the other reports and tell me why they were reports of violation of law. Yes, your honor. In California, whistleblower statute. Yes, thank you, your honor. And again, we contend that the other reports were not sufficient. So we have the statements that she's alleged in, again, probably late June 2014. The record's not totally clear on the timing. Jason Roga, Tiffany Labuga, and Dawn Doyle. And those are the two statements by Ms. Miranda that council has emphasized her statement that she prefers working with male employees and that she was tracking Ms. Brewer's FMLA leave. Neither of those statements, though, reporting those does not rise to the legal standard for demonstrating a protected reporting. By Ms. Brewer's own account, Ms. Miranda stated that Ms. Brewer was engaging in quote unquote FMLA misuse and was threatening to report her for that. Reporting an employee's violation of leave policies is part of a supervisor's job responsibilities, not a reasonably perceived violation of law. Ms. Brewer argues in her brief that she felt deterred, that is on appeal, she argues, that she felt deterred from taking FMLA leave as a result of Ms. Miranda's statements. But that argument is not supported by any evidence in the record and to the contrary is belied by the evidence, including Ms. Brewer's own testimony, that she was never prevented or deterred from taking extensive FMLA leave over the course of many years. As it relates to the evidence that Ms. Miranda had stated a preference for working with male employees, those kinds of stray remarks untethered from a personnel decision are not illegal. And we have Harris v. City of Santa Monica, which Ms. Brewer cited, and the patent case that revealed that. Ms. Brewer responds that under the reasonable belief standard, she might have believed that Ms. Miranda's statements were illegal and she's not required to be a lawyer and so on. She cites Janowitz for that proposition. But this court and the California courts have held that the reasonableness of alleged suspicions of illegal activity is measured by an objective standard and so presents a question of law, not a triable question of fact. And the cases we've studied in our briefs, like Patton, Huffman, Harris, Carter, all reflect that the kind of interpersonal complaints that Ms. Brewer was raising fall short of the legal standard for protected activity. There's a further point here, though, which is that we've focused on the objective reasonableness because that's the issue Ms. Brewer focused on. But the cases also reflect that it has to be a subjective belief in illegal activity. I reviewed the record and I have to say, I don't think there was any evidence where she said affirmatively, I believed I was reporting illegal activity. And to the contrary, her claims that she subjectively believes she was reporting illegal activity are belied by the fact that she never followed through with Laprino's formal reporting process. Until July 10th, she never spoke to Mr. Anderson, the HR manager, and under the Carter case, that's a relevant consideration here. Judge Marshall, I just have... Go ahead, Judge Marshall. Judge Marshall, please. The question that I wanted to ask, at some point... Judge, we're having the same problem we had before. Let's pause the clock again until we get better connection with Judge Marshall. Let's just wait. I think it'll resolve itself. If it doesn't, we'll fix it. Are our IT people on the line? Are we got the same problem? Yes, we're joining Judge Marshall's phone to the call, so hopefully that will have a better connection than her iPad. Good. I can see the clock now, but I don't know if my question was heard. No, why don't you, Judge, we can hear you now. Why don't we try again and if it's clear, we'll just start the clock. Judge Marshall, go ahead. We're still waiting for the phone connection. I'm still here, but I don't know... Okay, the question that I was asking is... Ah, still waiting for the phone connection. Yeah, let's wait for the phone connection. So, Judge, on your phone, there should be a button that says join audio. Council, part of your problem here is you have three judges who are not teenagers. I was looking at the other council presenting argument today and thinking I'm not a teenager anymore either. Thank you for that compliment. Judge Marshall, do you see the join audio button on your phone? Okay. Okay. Okay. Judge Marshall, can you hear us now? No. Okay. I see we've got a screen for Judge Marshall. Can you hear us, Judge Marshall? Not quite yet. Yes, I can hear. Okay. Judge Marshall was about to ask Mr. Hoffman a question when we broke off. Judge Marshall, you have the floor. Judge, did you want to ask Mr. Hoffman a question? No. Judge, I think we'll need to have her just call in by phone. It seems like the connection keeps... Yeah, I think that may make some sense. Yes. Let me try to get a hold of her. Okay. Are we hearing each other, Judge Marshall? No. Okay. Counsel, it's perfectly acceptable if you want to sit down while we're in this... I know you wanted to stand for your argument, but if you want to sit down, it's fine with us. Thank you, Your Honor. I stood all day. This is actually refreshing.  Okay. Judge Marshall, it looks like your phone has audio now. Do you hear us? Okay. Okay. Judge Marshall, can you hear us?  Okay. While we're waiting for Judge Marshall, I should tell counsel that it used to be when you argued cases in the U.S. Supreme Court, they broke for lunch at a specific hour. No matter where you were in the argument. There's Judge Marshall. All right. Let's try it again. It seems to be working. Go ahead and ask your question, Judge Marshall. So my question was, Brewer asked, how did she complain about harassment? And I think someone gave her information. Was that a part of the summary judgment? You know, Your Honor, there's a two-part answer to that. The evidence of that was in the summary judgment record. And the fact that she made that inquiry on July 10th to Cass Anderson, and that he responded and offered to help her with that, both in person and later by email, was in the summary judgment record. It was not identified in the summary judgment as a basis for whistleblower protections, though. And under Coombs and Moreno roofing, I think that's an important factor. But the other thing that I want to emphasize here is that counsel has noted that Mr. Anderson said, you know, you need to talk to somebody above my head. I'm not equipped to handle that. And I'm hesitant to go here because, as I think the court has recognized under the case law, the trial evidence is not relevant to the summary judgment. But it is something that Ms. Brewer has brought in here. And we know, based on that trial evidence, that the reason Mr. Anderson said those things is because he thought that she was talking about a harassment claim against him. And so he said, well, you need to take that to somebody else. But again, I don't think that's true. Let me ask one more question. And that question concerns the preferential treatment in which she identified specific persons. That they were getting preferential treatment, rate shifts, and scheduling. Was that evidence, those specific names, a part of the summary judgment record? That sort of disparate treatment was part of her gender discrimination claim. It was not mentioned as any of the purportedly protected reporting. That was not a feature of this. And so, okay, sure. And I see my time is short. Thank you, Judge Marshall. I see my time is short, so I want to run quickly through a few points here, if I may. The last one, as we noted, there's the July 10th, 2014 statements to Kez Anderson. We don't think that constitutes protected activity. And her question about filing a harassment claim under the Hussman case, Hussman versus Toyota Motor Credit, also falls short. It was a vague or conclusory remark that didn't provide Loprino sufficient notice of the conduct that was supposed to be investigated in order to constitute protected reporting. The next piece of the puzzle here on the Prima Facie case is the causal link. Ms. Brewer had the burden to prove that the allegedly retaliatory motive of individuals was the but-for cause for the decision to terminate. And the problem here is that most of the people that she's identified played no role in the investigation that led to her termination. And in fact, it's important to notice when applying the but-for standard that Mr. Hanks, who had no alleged retaliatory motive, managed the investigation. His conclusions rested not just on the reporting of Jennifer Miranda, but also on the reporting of Edgar Vega, as well as Mr. Hanks' interview of other palletizer operators and his inspection of the equipment. He then sends his reporting on to Robert Tetrick, who makes the decision to terminate. It's approved by corporate headquarters in Denver. There is no way that she could have met the but-for standard on this record. And finally, Your Honors, as my time runs out, if I could just indulge a little bit of extra time, I'd like to talk about pretext. I think the evidence is very clear that Loprino had a standing zero-tolerance policy. There's undisputed evidence that she violated it and that she was terminated in the same way that 10 other employees were terminated in the preceding three years. Now, counsel has noted that there's evidence. Thank you, counsel. You've gone over, and I think you made the point at the beginning, so we have it in mind. Thank you, Your Honor. Rebuttal. Thank you, Your Honor. A couple of issues that I want to bring to the court's attention. Number one, defendants are arguing that these were stray remarks. These were not stray remarks, but let's put them in context. This is an employee whose son has severe asthma, for which she applies for FMLA leave. She's then threatened by her supervisor, who says, I'm going to take the absences that you took as a result of your FMLA leave to get you fired. This is not a situation where, oh, I'm just looking at your FMLA, and this is my right as a supervisor. This is a direct threat to someone's job. Now, what happens afterwards? Ms. Brewer complains to someone else and says, this is getting out of hand. I'm being threatened with my job. And there's testimony that she started having panic attacks while at work. And she complains to Jason Rocha, who's a senior supervisor, who was present during the meeting for her lockout tagout violation, who says, this is happening. My supervisor is threatening my job because of my FMLA leave as a result of my sick son. What does he say in response? You're lucky you're not flipping burgers at Burger King. These are not stray remarks. These are remarks directly related to someone's employment. It's a direct threat to someone's employment to make a statement like that. And what happens? The very person that makes these threats creates a report that has been used by the management to get her fired. Now, in the report, there's a lot of disputed evidence. There's a lot of disputed facts. In fact, the report that's submitted to the court says we have a conflict in what the two employees are claiming, clearly showing that they're taking Miranda's word over Ms. Brewer, knowing full well by that time that Miranda is complaining about this retaliation and harassment. A couple of other issues. Counsel mentioned formal reporting process. There is no law under California, in California, that requires somebody to submit a formal request or state that, hey, I think that this violates the law. And we cited a lot of cases that talk about that. The employee just has to bring forward something that, in her opinion, violates the law. And she did so here. These are not interpersonal conversations. As far as Hasna versus Toyota, Hasna versus Toyota stands for the proposition that if an employee brings a complaint, that this allows an employer to investigate them. In other words, in Hasna, the person said I think we should have more diversity in the workplace. Here you have specific complaints about a specific employee that is threatening her job because of these protected actions. And based on that, based on that, this falls outside of the realm. Thank you, counsel. Thanks to both counsel. This case is submitted. We appreciate your patience during the argument. What I was about to tell you before is that the Supreme Court used to stop the argument wherever counsel was and then resume at two when it came back from lunch. So you've experienced the virtual equivalent of a former Supreme Court argument. And we thank you both for your arguments and your briefs. The case is submitted. Thank you, Your Honor.
judges: Tashima, Hurwitz, Marshall